IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| E. JEFFREY DONNER and JUDEE M. DONNER,<br><br>                        Plaintiffs,<br><br>v.<br><br>JACK NICKLAUS and JACK NICKLAUS GOLF CLUB, LLC,<br><br>                        Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:11-cv-489<br><br>Judge Clark Waddoups |

Before the court is Defendants' Motion for Summary Judgment (Dkt. No. 125) on plaintiff's intentional misrepresentation claim, which the Tenth Circuit remanded in *Donner v. Nicklaus*, 778 F.3d 857 (10th Cir. 2015), after this court dismissed it on defendant's second motion to dismiss. Also before the court is plaintiff's Motion to Strike Errata Sheet from the Deposition of Paul Stringer (Dkt. No. 136). The court has carefully considered the parties' motions, memoranda and supporting documentation, as well as the relevant law and the oral arguments of counsel. For the reasons stated below, the court GRANTS defendants summary judgment on statute of limitations grounds. As a result, plaintiffs' motion to strike the deposition errata sheet is MOOT.

## FACTUAL BACKGROUND

On December 31, 2007, plaintiffs Jeffrey Donner, a Colorado surgeon, and his wife, Judee Donner, entered into a purchase agreement contract with Mount Holly Club, LLC to invest

$1.5 million in Mount Holly Club, a planned private luxury resort to include a ski area and golf club to be designed by golfer Jack Nicklaus in the mountains above Beaver, Utah. Jack Nicklaus' anticipated role in the development of the golf course and his agreement to license his brand to market and advertise the club and resort is detailed in the background of the Tenth Circuit opinion and will not be repeated here. Neither Mr. Nicklaus nor Jack Nicklaus Golf Club, LLC was a party to the investment contract that forms the basis of the Donners' loss, and at no time prior to their investment did the Donners meet Mr. Nicklaus, nor did Mr. Nicklaus participate in any negotiations regarding the Donners' investments. *See Dr. Donner Depo. in Donner v. Bell*, 29:18-22. Mr. Nicklaus and Jack Nicklaus Golf Club, LLC's involvement prior to the Donners' investment was limited to joint marketing materials and press releases. *First Am. Compl.*, ¶ 78, 90).

The Donners' investment was preceded by a personal visit to the site of the planned Mount Holly Club in December 2007, where they met with Marc Jenson and his brother Steve Jenson, allegedly the principals of Mount Holly Club, LLC, which was the legal entity responsible for developing the property. (Dkt. No. 1, ¶¶ 18-19, 68). The Donners allege that the Jensons told them that their $1.5 million investment would include an estate lot in the Mount Holly project, rights to use the private ski resort, and a transferable membership in the Jack Nicklaus Golf Club, which "Marc Jenson asserted would allow all JNGC members to golf at all the other twenty-five Nicklaus private clubs around the world and to use on-site luxury Jack Nicklaus Golf Club houses." *Aff. of Dr. Donner* at 2-4 (Depo. Ex. 23 at AG950-52); *Judee Donner Depo.* at 7:6-21. The Mount Holly Club charter membership purchase agreement and associated documents signed by the Donners on December 31, 2007, further outlined these

details. The actual documents that were reviewed, signed, and received by the Donners, however, clarified that the investment provided them not with an actual estate lot, but a certificate that could be exchanged for one; and that the dates for completing the Mount Holly Club facilities that the Donners would eventually have a right to use were estimates dependent on obtaining the necessary permits and approvals. *Dr. Donner Depo.* at 171:7-172:2; 173:22-174:21; *Judee Donner Depo.* at 110:25-111:8.

The Donners both testified that it was very important to their investment that the Jensons represented that the project had "no debt" and was risk-free. *Dr. Donner Depo.* at 361:2-362:25; *Judee Donner Depo.* at 169:1-9; 170:10-20; 183:19-184:18. Although he "primarily" relied on the Jensons' representations as the basis of his investment, Dr. Donner was also allegedly influenced by Jack Nicklaus' partnership with and/or endorsement of the Mount Holly Club and its management, and investments by other alleged investors including Mr. Nicklaus. *Dr. Donner Depo. in Donner v. Bell* at 28:25-29:25.

Around January 11, 2008, less than two weeks after plaintiffs signed their purchase agreement for membership in the Mount Holly Club, they admit that they got their first "hint that this was a fraudulent project." *Dr. Donner Depo. in Donner v. Bell* at 33:20-34:22. Plaintiffs learned that Marc Jenson had a "very checkered criminal past" that caused them to be concerned that there was a problem with their investment. *Dr. Donner Depo.* at 277:7-21; *Judee Donner Depo.* at 36:10-37:13. After being informed by a friend that she should investigate Marc Jenson's "sordid criminal past" online, Judee Donner did her own search and found "his history of multiple criminal actions," including "many counts . . . jail time for taxation . . . defrauded individuals in different projects that he was involved in . . . appeared that there was securities

fraud . . . there was so many, it was just mind boggling." *Judee Donner Depo.* at 37:2-17. She immediately informed her husband about Marc Jenson's "terrible criminal past" and felt shocked by the threat this criminal history posed to their $1.5 million investment because "we relied on them and all the representation from Jack Nicklaus that this was, you know, this legitimate project." *Id.* at 38:10-39:1.

Shocked himself, Dr. Donner performed his own search and saw "bankruptcies, civil cases, and the current pending criminal case" against Marc Jenson. *Dr. Donner Depo.* at 278:13-279:23. After being "bushwhacked with the information that Mr. Jenson was a known criminal and had pending felony charges," Dr. Donner became "suspicious about what was going on" with his investment. *Dr. Donner Trial Testimony in Criminal Case State v. Marc and Stephen Jenson* at 101:1-4. Judee Donner was also "very concerned as of that point in time" for plaintiffs' $1.5 million investment in Mount Holly Club. *Judee Donner Depo.* at 39:2-5.

After learning about Marc Jenson's criminal history, plaintiffs agreed that Dr. Donner would "investigate and get to the bottom" of their investment concerns. *Id.* at 39:6-8. He began communicating with Timothy Bell, the individual who introduced them to the Mount Holly Club investment opportunity and to the Jensons.[1] *Dr. Donner Depo.* at 280:4-285:2. Dr. Donner asked Tim Bell whether Mr. Nicklaus or his organization were aware of Marc Jenson's criminal history. *Dr. Donner Decl.* at ¶ 11. On January 15, 2008, Dr. Donner received an e-mail from Mr. Bell forwarding an e-mail from Steve Jenson, which stated:

> Tim,
>
> These are the first of several documents I will be sending you. I spoke with the Nicklaus Group about an hour ago and they are preparing a letter that you can use

---

[1] The Donners have also sued Mr. Bell in district court in Colorado.

as well. As I mentioned to you, Jack Nicklaus and his officers have been fully aware of this situation since it happened and have no issues at all. I have worked closely with their executive staff and their legal counsel and once they understood exactly what this is and is not they had no problem at all. As I discussed with you earlier Marc is not an owner or officer or signatory on Mt. Holly Club, and never has been . . . The entire ownership group is also aware of the current legal situation that Marc is working on. Marc's responsibilities at Mt. Holly are in the marketing department. And has been since inception. I have additional documents coming your way.

Depo. Ex. 52.

A follow-up e-mail from Tim Bell to Dr. Donner on January 31, 2008 included an attached letter from Paul Stringer, (the Stringer letter), Senior Vice President of Business Development at Nicklaus Design,[2] to Steve Jenson, which read in part:

> Dear Steve,
>
> You asked me to send you a letter describing the relationship between the Nicklaus group of companies and Mt. Holly Club.
>
> Nicklaus Design and Jack Nicklaus Golf Club have a very good and strong relationship with the Mt. Holly Club. We have been fully advised by you of Marc Jenson's current legal situation from an unrelated deal and his earlier involvement in the project, and have accepted your business decision to continue his limited role as a consultant to the project while he is resolving that matter.
>
> We are also familiar with the ownership and management team of the Mt. Holly Club and have confidence in them. Our relationship with Mt. Holly Club is unusual in that Jack made the decision to defer a significant amount of Nicklaus Design's design fee for the Mt. Holly Club in return for a participation in future revenues from the project. Jack also accepted the honor of becoming the Founding Charter Member of the Mt. Holly Club, and although he has no role in management of your business, he is very interested in the ongoing success of the club.

*Id.*

Sometime in February 2008, Dr. Donner learned that Mount Holly Club, LLC was not debt-free, but was involved in a lawsuit with Dow Jones for non-payment of advertising bills.

---

[2] Nicklaus Design is not a party to this lawsuit.

*Dr. Donner Depo.* at 308:4-19. On March 3, 2008, Dr. Donner continued his post-investment

"due diligence" by asking CPA Michael Moore for advice on financial information he should

request from Mount Holly Club related to his investment. *Dr. Donner Depo.* at 285:3-288:12. On

the basis of Moore's advice, on March 9, 2008 Dr. Donner requested financial details and

documents from Steve Jenson and Mount Holly Club. *Dr. Donner Depo.* at 291:18-292:10;

Depo. Ex. 52. The Donners admit that they received these documents no later than the summer

of 2008, and that they learned from reviewing them that Nicklaus had not paid $1.5 million for

his membership. *Dr. Donner Decl.* at ¶ 22; Depo. Ex. 56 (DONNER 3470-71); *see also* Depo.

Ex. 53 (DONNER 2622-23) (confirming on July 22, 2008 Dr. Donner's knowledge from review

of documents that "most [charter members] didn't even come up with the initial investment.").

By December 2008, the Donners confirmed through Shawn Moore, a former marketing

executive of Mount Holly Club, that there was "definite fraudulent activity going on at the club"

including the Jensons' misappropriation of money. *Dr. Donner Depo.* at 77:17-78:7; *Dr. Donner

Decl.* ¶ 25. In January 2009, the Donners learned that Mount Holly Club had not paid the Jack

Nicklaus Golf Club for the Donners' golf club membership notwithstanding that the club had

allowed the Donners to use club membership rights as a courtesy throughout 2008. *Dr. Donner

Decl.* at ¶ 24. Dr. Donner then tried to enlist Jack Nicklaus and the Jack Nicklaus Golf Club in

recovering his investment, contributing a settlement, or engaging in the criminal prosecution of

the Jensons. *Id.* at ¶ 32. When this was not successful, Dr. Donner considered this "additional

evidence that defendants had intentionally engaged in fraud and were not also victims of the

scheme." *Id.* After Mount Holly Club, LLC's parent company filed bankruptcy, the Donners

settled with the parent company on their membership contract, "obtaining a lot near the ski area

and the right to trade that property for a lot in the development once it is platted. And, if the golf club and ski area are eventually developed, the Donners would be entitled to memberships." *Donner,* 778 F.3d at 863.

## PROCEDURAL BACKGROUND

On May 31, 2011, plaintiffs filed a complaint against Jack Nicklaus and Jack Nicklaus Golf Club, LLC, alleging that they were joint venturers with Mount Holly Club, LLC, and its principals, the Jensons. (*See* Dkt. No. 1). As joint venturers, the complaint alleged, Jack Nicklaus and Jack Nicklaus Golf Club, LLC should be jointly and severally liable for the loss of plaintiff's $1.5 million investment as a result of the Jensons' false representations that induced their investment, including misrepresentations about the financial status of the project; the lack of further requirements, conditions, or other obstacles to complete the project; and the expected construction start and completion dates. The Jensons also failed to disclose Marc Jenson's criminal background. As for Jack Nicklaus and the Jack Nicklaus Golf Club, LLC, the plaintiffs alleged that a joint marketing brochure endorsed the project and conveyed either expressly or implicitly that Mr. Nicklaus had invested at least $1.5 million to become a founding charter member. (*Id.*).

On March 15, 2012, the court heard oral argument and granted defendants' motion to dismiss all of plaintiffs' claims of alleged misrepresentation and joint venture liability against them, but allowed plaintiffs to file a motion for leave to amend the complaint. Plaintiffs moved to amend their complaint and the parties thereafter stipulated that plaintiffs may file an amended pleading.[3] The First Amended Complaint abandoned plaintiffs' claims that the Nicklaus

---

[3] Plaintiff's First Amended Complaint is attached as an exhibit to their motion for leave to amend (Dkt.

defendants were vicariously liable for the investment loss, and instead directly stated claims against them for negligent misrepresentation, intentional misrepresentation, and violations of the Interstate Land Sales Full Disclosure Act. (Dkt. No. 53-1). On March 27, 2013, this court heard oral argument and granted defendants' second motion to dismiss all claims against them with prejudice, finding that plaintiffs had not plausibly alleged reasonable reliance on the Nicklaus defendants' joint marketing materials in light of plaintiffs' later meetings with the Jenson principals prior to investing. (Dkt. Nos. 75, 82). The court also determined that plaintiffs had not plausibly alleged a relationship of trust or confidence with Mr. Nicklaus that would have imposed a duty on him to affirmatively correct alleged omissions. (Dkt. No. 82, pp. 26-27). The court also dismissed plaintiffs' Interstate Land Sales Full Disclosure Act claims because the alleged misrepresentations did not sufficiently state a claim under the Act. (*Id.* at p. 27). In the alternative, the court determined that plaintiffs elected their remedy under the Act by entering into a settlement agreement with Mount Holly Club, LLC's parent company regarding the investment contract. (*Id.* at p. 28).

The Donners appealed this decision to the Tenth Circuit Court of Appeals. On February 19, 2015, the Tenth Circuit affirmed this court's dismissal of the Interstate Land Sales Full Disclosure Act and the negligent misrepresentation claims against defendants. *Donner,* 778 F.3d 857. With respect to the intentional misrepresentation claims, the Tenth Circuit also agreed with this court that the First Amended Complaint failed to plausibly state a claim against defendants on all alleged intentional misrepresentations or omissions except one. *Id.* That representation was regarding Mr. Nicklaus' membership.

---

No. 53) but was never subsequently filed with the court.

Specifically, the Tenth Circuit determined that by representing in a particular marketing brochure that Mr. Nicklaus was a "charter member," Mr. Nicklaus and the Jack Nicklaus Golf Club, LLC may have "impli[ed] that [Mr. Nicklaus] paid the $1.5 million purchase price for his membership." *Id.* at 869-70. The Tenth Circuit stated:

> The brochure describes a charter membership based on the $1.5 million purchase price. Mr. Nicklaus's "founding membership" was "honorary," meaning he paid nothing. Though "charter membership" and "founding membership" may ordinarily be synonymous, the price difference (free versus $1.5 million) could have struck the Donners as significant.
>
> The Donners allege in the amended complaint that they were induced to act by Mr. Nicklaus's willingness to pay $1.5 million for his charter membership. It was the purchase price, rather than the title of the membership, that allegedly influenced the Donners.

*Id.* at 870.

Following the Tenth Circuit's remand for further proceedings on these allegations, the parties completed discovery. Defendants have now moved for summary judgment on the timeliness of plaintiffs' claims against defendants and on whether plaintiffs reasonably relied on the alleged false implication that Jack Nicklaus paid $1.5 million for a Mount Holly Club membership.[4] For their part, plaintiffs move that the court strike the deposition errata sheet of Paul Stringer. Because the court holds that the plaintiffs' cause of action is barred by the statute of limitations and because this ruling is dispositive, the court does not address defendants' reasonable reliance defense or plaintiff's motion regarding the deposition errata sheet.

---

[4] The allegation raises an interesting question about the proof required to prove an intentional *implied* misrepresentation and the reasonableness of any reliance a plaintiff exercised upon a plaintiff's own inference. The parties do not identify nor has the court been able to locate any case law addressing how an intentional fraud claim premised on an inference can be proved.

## ANALYSIS

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a summary judgment motion, the court examines "the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (internal quotations omitted). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendants "may use a motion for summary judgment to test an affirmative defense," such as a statute of limitations defense, that "entitles that party to a judgment as a matter of law." *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). Defendants who move for summary judgment on an affirmative defense bear a "more stringent" burden of proof that requires them to "establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Donner*, 778 F.3d at 876.

## I.  Statute of Limitations

Defendants move for summary judgment on the affirmative defense that plaintiffs' intentional misrepresentation claim is barred by the statute of limitations. The parties agree that plaintiffs' time for filing their claim is governed by the three-year statute of limitations for fraud claims found at Utah Code Ann. § 78B-2-305(3):

> An action may be brought within three years for relief on the ground of fraud or mistake; except that the cause of action does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake.

This lawsuit was filed on May 31, 2011; however, by agreement, the parties tolled the statute of limitations as of April 14, 2011. Therefore, to succeed on their motion for summary judgment on timeliness grounds, defendants must establish as a matter of law that the Donners discovered the "facts constituting the fraud" earlier than three years prior to the tolling date, i.e., before April 14, 2008. U.C.A. § 78B-2-305(3).

The First Amended Complaint alleges that plaintiffs were intentionally defrauded because (1) Marc Jenson had a criminal past, (2) the Mount Holly Club facilities and golf club did not exist, (3) the project lacked regulatory approval for development and authorization to construct a golf course, (4) they did not receive on December 31, 2007 an Estate Lot valued at a minimum of $1.5 million, and (5) the project was not free of debt. (Dkt. No. 53-1 at ¶¶ 8, 55-58, 70-71, 87, 92, 95-97, 102, 111, 113). Additionally, as for the complaint's allegations about false representations regarding Mr. Nicklaus's membership, the Tenth Circuit determined that the claim was actionable only if a fact-finder could determine it was reasonable for the Donners to infer from the joint marketing brochure that Jack Nicklaus implied that he paid $1.5 million for a membership in the Mount Holly Club. *See Donner*, 778 F.3d at 870 ("It was the purchase price,

rather than the title of the membership, that allegedly influenced the Donners" and "the price difference (free vs. $1.5 million) [that] could have struck the Donners as significant.").

The court begins with defendants' undisputed evidence that the statute of limitations for fraud began to run before April 14, 2008. The Donners admit that by December 31, 2007, the date they closed on the Charter Membership Purchase Agreement for the Mount Holly Club project, they knew that "there were further requirements, restrictions, and impairments to proceeding with completion of the [Mount Holly Club], including that [Mount Holly Club, LLC] needed to obtain additional permits and approvals; and Plaintiffs would not receive title to a residential lot until additional development approvals were obtained." (Dkt. No. 130, p. 13).[5] Based on these admissions, it is undisputed that at the time they signed the purchase agreement contract on December 31, 2007, the Donners actually discovered the falsity of three misrepresentations alleged in their intentional misrepresentation claim against defendants.

The Donners also admit that on January 11, 2008, eleven days after investing $1.5 million in the project, they discovered that Marc Jenson, known to them at the time as a "principal" of the Mount Holly Club, *see Compl*. at ¶ 19, was a "fraudster" with a "checkered criminal past." (Dkt. No. 130, p. 13-14). They also admit that on this date they were shocked to learn that Jenson had "past bankruptcies, civil cases, criminal cases, and a pending criminal case," and became concerned that they had been "duped" into investing in a "fraudulent project." *Dr. Donner Depo*. at 277:22-24; 279:20-23; 298:24-299:4. Plaintiffs admit that this discovery caused them to begin a further investigation into their investment in the Mount Holly Club. (Dkt. No. 130, p. 13-14). Based on these admissions, it is undisputed that the Donners discovered

---

[5] Citations to page numbers from memoranda on the court's docket reflect the court's docketing page numbers rather than the memoranda's internal page numbers.

another misrepresentation or omission alleged in their cause of action for fraud against defendants by January 11, 2008; it is further undisputed that on this date, the Donners actually began investigating their investment.

The record also reveals that the Donners were on notice by at least February 29, 2008 that the project was burdened by outstanding debts in light of a pending lawsuit with Dow Jones for non-payment of advertising bills. *Dr. Donner Depo.* at 308:4-23. Because of evidence the project was not debt-free along with suspicions about Marc Jenson's criminal history, by no later than March 3, 2008, Dr. Donner consulted his CPA for advice on how to proceed with post-investment "due diligence" into the actual financial status of the Mount Holly Club project. *Dr. Donner Depo.* at 285:3-289:8. On the basis of that advice, on March 9, 2008 Dr. Donner requested financial details and documents from Steve Jenson and Mount Holly Club that eventually led to the discovery that Jack Nicklaus had not paid for his membership, whatever its title.[6] *Id.* at 291:19-292:7.  Based on this record, it is undisputed that before April 14, 2008 the Donners had discovered or were already conducting the investigation that led to the discovery of all other misrepresentations alleged in their cause of action against defendants.

Because defendants have met their burden to come forward with undisputed evidence supporting their position that the statute of limitations bars plaintiffs' action, the Donners must oppose summary judgment with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In response, the Donners focus their attention on the following language of

---

[6] On summary judgment, the court must examine the record to show that there is no genuine issue of material fact. Although defendants did not include the facts in this paragraph in the "Undisputed Facts" section of their brief, they directed the court's attention to them, and because they are party admissions in deposition testimony, the court rejects plaintiffs' argument that DUCivR 56-1(c)(3) precludes it from considering them. *See Berry,* 586 F.3d at 808.

the January 31, 2008 letter from Paul Stringer to Steve Jenson, which defendants claim put plaintiffs on notice that Mr. Nicklaus' membership was honorary, or in other words, provided at no cost:

> Jack also *accepted the honor of becoming the Founding Charter Member* of the Mt. Holly Club, and although he has no role in management of your business, he is very interested in the ongoing success of the club.

Depo. Ex. 52 (emphasis added).

This language, the Donners allege, not only did not put them on notice that Mr. Nicklaus had not paid the $1.5 million purchase price, but it "conceal[ed] the fraud" and delayed their discovery that this representation was false.[7] (Dkt. No. 130, p. 35 n.5). The plaintiffs ignore the undisputed evidence that they had already obtained knowledge of potential fraud, which led them to begin the investigation that led to discovery that their investment was fraudulently induced, because they argue that out of all misrepresentations alleged in their First Amended Complaint, the representation about the $1.5 million purchase price is the only one whose discovery can trigger the running of the statute of limitations.[8] (*Id.* at p. 33). The Donners have not cited to any case law that directly supports their unusual statement of the applicable discovery rule; therefore, the court clarifies Utah's governing legal standard.

---

[7] Plaintiffs argue that the term "honor" has several meanings and is not equivalent to "honorary," meaning free; they also argue that even the term "honorary" does not always connote that something has been provided for free. (Dkt. No. 130, pp. 40-41). As the non-moving parties, plaintiffs allege that the court must view all inferences about plaintiffs' understanding in their favor and leave the question of what plaintiffs understood by this letter to a finder of fact. (*Id.* at 42). Assuming *arguendo* that plaintiffs may be correct had this been the first indication of their investment having been fraudulently induced, the court nevertheless finds that plaintiffs were already on inquiry notice of their fraud claim before they received this letter, and therefore, this letter is relevant to its grant of summary judgment to defendants only because it confirms the plaintiffs were on notice of the relationship between the Jensons, the Nicklaus defendants, and the Mount Holly Club project. *See infra*, pp. 18-20.

[8] Plaintiffs argue that only discovery of the Nicklaus defendants' role in the alleged fraud matters. (Dkt.

### A. Statutory Discovery Rule

Generally, a statute of limitations begins to run "upon the happening of the last event necessary to complete the cause of action." *Russell Packard Dev. v. Carson*, 2005 UT 14, ¶ 20. "Once a statute has begun to run, a plaintiff must file his or her claim before the limitations period expires or the claim will be barred." *Id.* "Mere ignorance of the existence of a cause of action will neither prevent the running of the statute of limitations nor excuse a plaintiff's failure to file a claim within the relevant statutory period." *Id.*

Because a party can be injured by fraud and, through no fault of his or her own, not know it at the time of the injury, U.C.A. § 78B-2-305(3) provides a "discovery rule" that tolls the accrual of the statute of limitations until the aggrieved party acquires information which, if pursued, would lead to discovery of "the facts forming the basis of the cause of action." *Shiozawa v. Duke*, 2015 UT App 40, ¶ 13 (Utah Ct. App. 2015); *Russell Packard* at ¶ 21. This rule tests for diligence both in investigation and in bringing a cause of action, because "[a] plaintiff is deemed to have discovered his action when he has actual knowledge of the fraud, or by reasonable diligence and inquiry should know, the relevant facts of the fraud perpetrated against him." *Colosimo v. Roman Catholic Bishop*, 2007 UT 25, ¶ 17 (quoting predecessor statute to Utah Code Ann. §78B-2-305(3) (internal quotations omitted); *see also Russell Packard* at ¶ 23, *Pierucci v. Pierucci*, 2014 UT App 163 n.5 (stating that the accrual of the statute of

---

No. 130, p. 48, n.12) ("The constructive knowledge that might arise concerning other alleged frauds does not put Plaintiffs on constructive knowledge of all other possible frauds. Actual knowledge of other frauds only triggers inquiry notice to begin conducting an investigation."). The court clarifies that although the amended complaint alleges numerous misrepresentations, plaintiffs have made only one claim of fraud against the Nicklaus defendants based on the single injury to their Mount Holly Club investment contract.

limitations is triggered not just by actual but by constructive knowledge of the facts, i.e. the point the injured party "*should have* discovered the fraud.") (emphasis in original).

An injured party should discover the fraud, or in other words is deemed to have constructive knowledge of the cause of action, when he or she obtains the "means of knowledge," in other words, the "opportunity of knowing the facts constituting the alleged fraud." *Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993). That opportunity occurs upon discovery of some fact that "should have incited suspicion of fraud" because such discovery "would have then sparked further inquiry." *Id.* at 1197. *See also Shiozawa* at ¶ 13 ("[A] party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge. Instead, if the facts known to a plaintiff would prompt a reasonably prudent person to further investigate, the plaintiff should make further inquiry.") (internal punctuation and citations omitted). This moment is frequently referred to as "inquiry notice," and it constitutes discovery that triggers the running of the fraud statute of limitations. *Pierucci* at *13-14 (stating that constructive discovery consists both of record notice and inquiry notice that is presumed "because of the fact that a person has knowledge of certain facts which should impart to him, or lead him to, knowledge of the ultimate fact.").

Once inquiry notice triggers the running of the statute of limitations, knowledge of all facts that were "discoverable during the limitations period" is imputed to the plaintiffs and that requires the plaintiffs to timely protect their legal interests.[9] *Colosimo*, 2007 UT 25, ¶ 18.

---

[9] By contrast, plaintiffs argue, without reference to relevant case law, that "[t]he 'constructive knowledge' that triggers the accrual of the statute of limitations for fraud is not equivalent to 'inquiry notice.' 'Inquiry notice' refers to the point at which the plaintiff had suspicions that triggered her duty to investigate potential claims in a reasonable manner. 'Constructive knowledge' is a later point at which the reasonable investigation would have conferred the plaintiff with knowledge of the facts of the fraud." (Dkt. No. 130, p. 36). The court finds no support for this interpretation of "constructive knowledge" in the statutory

Learning "every detail of the alleged fraud or even discover[y] that actual fraud did in fact occur" is not required before the statute begins to accrue. *Baldwin* at 1197. And, while ordinarily it is left to the finder of fact to determine when a reasonably prudent person should have discovered his or her claim, summary judgment is not precluded when "the facts are so clear that reasonable persons could not disagree about the underlying facts or about application of the governing legal standard to the facts," or when "the facts underlying [an] allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that the claim fails as a matter of law."[10] *Russell Packer* at ¶ 39.

With this governing law in mind, the court rejects plaintiffs' argument that a separate statute of limitations applies to each alleged misrepresentation and/or defendant with a relationship to the underlying fraud. The Donners' First Amended Complaint alleges a single cause of action for intentional fraud, specifically that they invested in the Mount Holly Club because of their reliance on a lengthy set of allegedly intentional misrepresentations. *First Am. Compl.*, p. 27-28. When the Tenth Circuit upheld this court's dismissal of all of these alleged misrepresentations but the three regarding Mr. Nicklaus, it did not disconnect these

---

discovery rule setting, which would essentially transform constructive knowledge from imputed or presumed knowledge arising from the duty to inquire to a form of actual knowledge.

[10] Based on *Anderson v. Dean Witter Reynolds*, 920 P.2d 575, 579 (Utah Ct. App. 1996), plaintiffs argue instead that once a party is on inquiry notice and actually begins an investigation, summary judgment is inappropriate because a fact-finder is required to evaluate whether the investigation that eventually led to the discovery of the facts was reasonably diligent. Only if a party does not begin an investigation or a fact-finder concludes that the investigation was not reasonably diligent, they claim, should inquiry notice trigger the running of a statute of limitations. Plaintiffs have stated not the statutory discovery rule, but the second half of the fraudulent concealment equitable discovery rule (which is always preceded by an evaluation, first, of whether a defendant fraudulently concealed the cause of action). *Russell Packard* at ¶ 26. As will be seen below, the fraudulent concealment equitable discovery rule is inapplicable where a statutory discovery rule applies.

representations from the basis of plaintiff's cause of action, namely, the injury to their purchase agreement investment in a charter membership at the Mount Holly Club, nor did it establish a new statute of limitations triggering date for the cause of action limited only to the surviving allegations. *See Donner* at 867-70. In other words, the relevant facts that form the basis of a cause of action for a fraudulently induced investment are those that cast doubt on the investment. A single intentional fraud claim for a single injury does not have separate statute of limitations for each defendant or for each alleged misrepresentation within that claim.[11]

*Colosimo* demonstrates why the law does not allow the Donners' cause of action against the Nicklaus defendants to be tolled once the Donners were on inquiry notice of potential harm to their investment from other principals and parties to their investment. 2007 UT 25. In *Colosimo*, plaintiffs who knew they had been abused by a Catholic priest who was also a teacher at Judge Memorial High School between 1970 and 1975 did not bring suit against the local and regional dioceses or the High School and its board of trustees until 2003. *Id.* at ¶¶ 2-7. Because fraud was one of the causes of action, the plaintiffs argued that the discovery rule prevented the statute of limitations from running until plaintiffs became aware not just of injuries caused by the priest, but specifically of their cause of action against the institutional defendants. *Id.* at ¶ 12.

The Utah Supreme Court determined that because the plaintiffs already knew or were constructively on notice of the relationships between the priest and the institutional defendants at the time of the injury, the statute of limitations was triggered and had begun to run. *Id.* at ¶¶ 17-18. Furthermore, it held that knowledge of facts that are "discoverable during the limitations

---

[11] Plaintiffs persuasively argue that "[w]ere it otherwise, a plaintiff who files suit more than three years after confirming 99 out of 100 misrepresentations could stay in court and litigate the hundredth." (Dkt. No. 140, p. 16). The law does not allow tolling of the statute of limitations until the plaintiff is able to discover all of the facts constituting the fraud. *Russell Packard* at ¶ 39.

period" is imputed to plaintiffs who are on inquiry notice, or in other words, who have been placed under a duty to investigate. *Id.* at ¶ 18. Plaintiffs argue that *Colosimo* does not apply to them because the Nicklaus defendants "were not obviously parties potentially responsible if the Jensons committed fraud or other wrongdoing." (Dkt. No. 130, p. 44). This argument misses the point. It is the plaintiffs' knowledge of the relationship between the potential defendants, not the potential allocation of responsibility, that triggers both the duty to inquire and to bring causes of action against any and all defendants who have a relationship to the injury within the limitations period. *See Colosimo*, 2007 UT 25 at ¶ 18. Here, plaintiffs knew at the time of their investment that there was a relationship between the Nicklaus defendants and their Mount Holly Club investment because of the joint marketing and press release materials they viewed and because of the representations made to them about the Nicklaus defendants by the Jensons and Timothy Bell. Because of that plaintiffs knew or were constructively on notice of any duties that may be owed to them by the Nicklaus defendants as a result of their participation in the marketing campaign. Moreover, details about the specific relationships between the Jensons, Tim Bell, Mount Holly Club, LLC, and the Nicklaus defendants were discoverable during the limitations period.

In essence, then, the court agrees with plaintiffs that the Stringer letter did not trigger the running of the statute of limitations. The court disagrees, however, that a fact-finder is required to determine whether the Donners' interpretation of the Stringer letter reasonably concealed from them their cause of action for fraud; or, similarly, whether the Donners' investigation of the Jensons' and Tim Bell's involvement was so reasonable that it tolled their duty to investigate potential causes of action against the Nicklaus defendants. This is because prior to receiving the

Stringer letter, the Donners were already on inquiry notice of a claim for fraud against anyone who had a known relationship to their investment. *Colosimo*, 2007 UT 25. To demonstrate that there is no genuine issue of fact precluding summary judgment on defendants' statute of limitations defense, the court reviews what the Donners actually or constructively knew before April 14, 2008 and how application of the statutory discovery rule requires this result.

First, the Donners admit that at the time they signed their purchase agreement in December 2007, they had actual knowledge of some of the misrepresentations alleged in their cause of action against defendants. Under Utah law, a party asserting a claim for being fraudulently induced into signing a contract cannot "take refuge in the shelter provided by the discovery rule" when the opportunity to know the facts constituting the alleged fraud is available to the plaintiff at closing. *Wilcox v. Career Step, LLC*, 929 F. Supp. 2d 1155, 1163 (D. Utah 2013).

Second, the Donners admit that on January 11, 2008 they discovered Marc Jenson's criminal history and that it shocked them into investigatory action. "Awareness of other lawsuits or criminal fraud convictions involving a defendant puts a plaintiff on inquiry notice of the probability of fraud within another transaction involving the defendant." *Sterlin v. Bioimmune Sys.*, 154 F.3d 1191, 1204 (quoting *Lenz v. Assoc. Inns & Restaurants Co. of Am.*, 833 F. Supp. 362, 375 (S.D. N.Y. 1993)). Once plaintiff has discovered "facts calculated to excite inquiry which impose a duty of reasonable diligence, and which, if pursued, would disclose the fraud," the discovery rule has been triggered and the fraud statute of limitations has begun to run. *Id.* at 1203 ("Plaintiff need not have fully discovered the nature and extent of the fraud before he was

on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.") (internal punctuation omitted).[12]

Third, the record reflects that the Donners were aware the Mount Holly Club project was not debt-free by February 29, 2008, and that by March 9, 2008, as a result of suspicions of fraud, Dr. Donner had followed his CPA's advice and requested financial details and documents from Steve Jenson and Mount Holly Club. Notwithstanding the Donners' earlier receipt of the January 31, 2008 Stringer letter, the March request for documents from the Jensons led, by July 2008, to the Donner's admitted actual discovery that Mr. Nicklaus did not pay any money for his membership. *Dr. Donner Decl*. at ¶ 22, Depo. Ex. 56 (DONNER 3470-71); *see also* Depo. Ex. 53 (DONNER 2622-23). The Nicklaus defendants did nothing to prevent or delay that discovery.

Based on these admissions, it is undisputed that plaintiffs had actual or constructive knowledge of their fraud claims against defendants before April 14, 2008, and under Utah law there is nothing left for a fact-finder to decide about when they did or should have discovered it. Plaintiffs were on notice of half of the alleged misrepresentations in their amended complaint at the time of closing; discovered the criminal history of one of the principals less than two weeks later; and launched an investigation that led to their discovery six months later, well within the

---

[12] Plaintiffs argue that *Sterlin* supports their argument that inquiry notice may trigger the duty to investigate, but it does not trigger the accrual of the statute of limitations period until the point at which a reasonable investor's investigation should have discovered the fraud. (Dkt. No. 130, p. 36, n. 6). However, this part of *Sterlin*'s holding addresses the unique characteristics of a one-year statute of limitations applicable to claims under § 10(b) of the Securities Exchange Act of 1934, and was developed by the Tenth Circuit to strike a balance between the "two competing policies underlying the securities laws," namely the need for timely filings versus the need to avoid "premature or groundless suits" because the short one-year statute of limitations can require plaintiffs to file suit before they can determine if there is merit to a securities fraud claim. *Sterlin*, 154 F.3d at 1202. This holding does not apply to Utah's statutory discovery rule for fraud, although the *Sterlin* court's explanation of what triggers inquiry notice is directly on point, and even clarifies that intervening written assurances from a defendant's CEO do not alleviate a plaintiff's duty to investigate a cause of action against defendants if inquiry notice has previously been triggered. *Id.* at 1204.

first year of the three-year statutory limitations period, of all remaining misrepresentations alleged in their complaint, including that Mr. Nicklaus had not paid $1.5 million for his membership.  The court cannot reconcile these undisputed facts with plaintiffs' argument that the January 31, 2008 Stringer letter fraudulently concealed or delayed their reasonable investigation and discovery of their cause of action against defendants and finds that the letter is not a material fact that precludes summary judgment.  By not filing their cause of action until May 2011, the Donners failed to timely bring their suit for fraud against defendants before it expired, and their claims are barred.

### B.  Fraudulent Concealment Rule

Although the statutory discovery rule for fraud claims applies in this case, based on the nature of plaintiffs' arguments, the court briefly clarifies the rules that do not apply. In the absence of a statutory discovery rule, two equitable discovery rules can toll a statute of limitations. *Russell Packard*, 2015 UT 14 at ¶ 25. The fraudulent concealment rule tolls a statute of limitations that does not contain a statutory discovery rule when the plaintiff does not become aware of facts constituting the cause of action because they were affirmatively concealed by the other party during the time in which the plaintiff otherwise could have or reasonably should have discovered them. *Id.* at ¶ 29. Under this rule, the court also evaluates the timeliness of plaintiff's action based on whether its late filing was reasonable in light of the defendant's concealing actions. *Id.* at ¶ 30. The second equitable rule is the exceptional circumstances rule, which applies when "the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action." *Id.* at ¶ 25.

The Donners do not allege extraordinary circumstances; therefore, the court does not address that rule. The Donners do vaguely allege, however, that defendants fraudulently concealed knowledge of their cause of action from them during the statutory limitations period.[13] Therefore, a brief discussion of why the fraudulent concealment version of the equitable discovery rule does not apply is in order.

Under Utah law, the statutory discovery rule and the equitable discovery rules are "mutually exclusive." *Nolan v. Hoopiiaina,* 2006 UT 53, ¶ 35; *Russell Packard* at ¶ 25 ("these equitable exceptions apply *only* where a statute of limitations does not, by its own terms, already account for such circumstances—i.e., where a statute of limitations lacks a statutory discovery rule."). The Utah Supreme Court has specifically stated that it is "inappropriate to apply the concealment version of discovery rule in the context of the three-year statute of limitations for fraud." *Russell Packard* at ¶ 25. After *Russell Packard* was decided in 2005, Utah courts addressing the statute of limitations for fraud claims pursuant to U.C.A. 78B-2-305(3) have been careful to analyze those claims under the statutory rule. The statute of limitations for other causes of action that do not contain a statutory discovery rule are analyzed using the equitable tolling rules where the facts alleged make them applicable, although the courts are not always careful in

---

[13] Most of plaintiffs' arguments alleging fraudulent concealment relate to the title of Mr. Nicklaus' membership, rather than to its purchase price. Furthermore, although they allege that the Stringer letter concealed the purchase price of Mr. Nicklaus' membership, they assert that they had "discovered facts sufficient to provide actual and constructive knowledge of claims against Defendants in December 2008, or early January 2009." (Dkt. No. 130, p. 15). The only facts they allege they discovered in December 2008 or early January 2009, however, are that Shawn Moore confirmed that the Jensons misappropriated money from the Mount Holly Project and did not pay the Nicklaus defendants for the Donners' golf club membership, and that the Nicklaus defendants declined to assist the Donners in the recovery of their investment, in the prosecution of the Jensons, or to make a contribution to a settlement. *Dr. Donner Decl.* at ¶¶ 25, 32. Plaintiffs do not explain how these facts revealed to them the allegedly concealed specific knowledge they were waiting for, i.e., that defendants paid nothing for Jack Nicklaus' honorary membership. To the contrary, they admit that based on their investigation they knew or should have known this specific fact by July 2008. *Id.* at ¶ 22.

every case to identify which causes of action are being analyzed under the equitable rules. *See Town of Cornish v. Veibell*, 2009 UT App 117; *Hampton v. Prof'l Title Servs.*, 2010 UT App 294 (Roth, J. concurring); *Pierucci*, 2014 UT App 163; *Shiozawa,* 2015 UT App 40; *Colosimo*, 2007 UT 25.

Here, the court has been careful to consider plaintiffs' fraud claim under the appropriate discovery rule. The goals of the statutory discovery rule for a fraud claim and the fraudulent concealment equitable discovery rule for causes of action that do not have a statutory discovery rule are equivalent; however, and are intended to ensure that the accrual of the statute of limitations does not take place until facts forming the basis of the fraud have actually or constructively been discovered. *Colosimo*, 2007 UT 25 at ¶ 49 ("A plaintiff cannot be expected to inquire about the existence of a claim that is entirely concealed from him when there is nothing to put him on inquiry notice.")

In this case, the results would be the same regardless of which rule applied because plaintiffs were on inquiry notice of fraud before they ever received the Stringer letter. Therefore, even if the fraudulent concealment discovery rule applied rather than the statutory discovery rule, it could not have tolled the statute of limitations because a fact-finder cannot find that "given *the defendant's actions*, a reasonably diligent plaintiff would not have brought suit within the statutory period." *Id.* at ¶ 26 (emphasis added).

## CONCLUSION

For the foregoing reasons, the court GRANTS summary judgment to defendants on the grounds that plaintiffs' claims are barred due to the expiration of the statute of limitations.

Plaintiffs' motion to strike Paul Stringer's deposition errata sheet is therefore MOOT.  The court directs the clerk of court to enter judgment in favor of defendants. The case is closed.

DATED this 15th day of July, 2016.

BY THE COURT:

_____
Clark Waddoups
United States District Judge